Good morning, everyone. The first argued case this morning is No. 17-2508, Athena Diagnostics, Inc. v. Mayo Collaborative Services. Mr. Governor. Good morning. I'm Adam Gatton. I'm here this morning on behalf of Athena and Oxford and the Max Planck Institute. The district court got the Mayo Alice 101 analysis wrong at Step 1 and Step 2 for the same fundamental reason, and that is that the court oversimplified the claims and massively oversimplified the specification. And then procedurally, the court sort of set Athena up to respond to a motion for summary judgment and to provide evidence and then refused to allow it to rely on that evidence, again taking a view of the specification and the claims that was as if viewing it through a straw. Now at Step 1, this oversimplification… Counsel, these claims are awfully simple. There doesn't seem to be a lot to them, and it's not clear to me how they differ from the other Mayo case. You're taking musk and you're combining it with a bodily fluid. There doesn't seem to be a lot to that. And then you get an antibody, musk antibody complex, which surely is due to natural law. And then one immunoprecipitates with a label wherein, up here, mental, it indicates whether the person is suffering from one of these muscular diseases, and that is seemingly a natural relationship too. So how do we get around a basic law given to us by the Supreme Court in the earlier Mayo case? Well, what you just described, after all, is a process that requires a person to do certain things, right? And so when you have a… a method is a process, and processes are categorically eligible under Section 101. They are only ineligible when the process or the method sort of wholly embodies nothing but a natural law. In ordinary physical processes. That's what the earlier Mayo case involved. But here we certainly don't have an ordinary physical process, right? The first step, contacting a bodily fluid with a labeled musk or epitope or antigenic determinant, those are absolutely novel, non-natural, synthetic, labeled fragments of proteins that never anywhere exist naturally in bodily serum or plasma or whatever the sample might be. And the specification goes into great detail about how the inventors found the binding sites on this very complex, enormous transmembrane protein, and how they developed the fragments that would allow the binding portion, the epitope or antigenic determinant, to be in bodily fluid, to be detectable, and still permit for specific binding of the antibodies. I don't see that in the claims. Well, the claims require the use of those man-made fragments and epitopes, antigenic determinants, in the first step of the process. You can't do this process without labeled musk or one of these absolutely novel and non-natural fragments. How do you respond to the point made by the district court and your adversary about how your specification suggests that the technique for labeling the musk and other steps in the claim are just conventional steps? Well, I think you have to look specifically at what the specification says. And my response is, as I said at the beginning, that's very much looking at the claims in the specification through a straw. The statement to which you're referring and on which the district court overly relied is that immunoprecipitation and iodination are standard techniques in the art. Now, it might be the case that immunoprecipitation, that is how one gets some antibody antigen complex out of the solution, out of serum, that might have been known. But the claims, immunoprecipitation is just one part of it. To get immunoprecipitation to work in this assay, which is a novel assay and the first assay of any kind for detecting musk autoantibodies, you must have these non-natural synthesized fragments labeled with histidines possibly or epitope tags, as the specification describes, and then further labeled with radioactive iodine. Is that all special for musk? I mean, is that the things you're referring to? Or is that something that would only apply because we're talking about musk? Or would that apply to any protein? Well, I think one thing that the DiTomaso Declaration covers in great depth, and there's certainly nothing in the record that suggests otherwise, even without the declaration, is that these transmembrane proteins, or proteins in general, are massive, complex molecules. They're not like DNA that always works the same way, that just has the four base pairs and the same backbone and all the rest of it. So how you determine where an antibody binds a protein, and that's sort of shown in Figure 1 in the patent and described later on, is different for every protein. You've got to find a specific binding site. And then in order to make a protein like musk, which is a muscular protein and doesn't exist in serum or in the blood, in order to get it to work in an assay like this, you've got to sort of chop it up and make sure that you've got the right epitope, that is the portion of it to which the antibody specifically binds, so that it can be detected and so that you don't interfere with the specific binding. And that will be different for every protein. I see how that's discussed in detail in your declaration, the expert's declaration. Where could I find that in the specification? Figure 1 of the specification, Appendix 37 for now, Figure 1A sort of represents the work the inventors did to figure out which portion of the transmembrane protein, so the part below the horizontal line there is within the cell, and then the IgG regions, which are extracellular, they're outside the cell. And they discovered, as discussed later in the specification, and I'll certainly find it, that the antibody of interest, the autoantibody to musk bound specifically at the IgG1 to 2 region. Without that discovery, and then without the work that the inventors put in to find and make the fragments, which is also discussed in the specification, I'm happy to direct you to the relevant portions, you couldn't do this novel assay. You're really talking about enablement, aren't you? All these steps to find the right location, those aren't in the claims. Well, the claims require the use of these fragments in the method. So a person of ordinary skill in the art would understand and would know to go to the spec to see what had to go into making this method possible. So I think it is an eligibility. It might also be an enablement question when we get there. But I think it's an eligibility question because the issue is, is this an off-the-shelf, anyone knows how to do it, assay such as you had, in certainly all the earlier DNA cases and in many others. How does this immunoprecipitation work? Does it result from the formation of the complex? It just drops out? Or does one have to add some precipitating agent? In this method, there's a second antibody that's added to cause the first complex to precipitate out. But what makes these claims eligible in contrast to all the DNA cases and to the Mayo case with biopurine and the Cleveland Clinic case with MPO is that this assay did not exist before. There was no musk assay whatsoever of any kind before this one. But this isn't a novelty question. And discovering something new is not necessarily the answer to the natural processes exclusion. Well, I didn't mean it to come across as a novelty question. I was comparing it to those earlier cases because in all of those earlier cases, the courts make the point that with respect to DNA, all these techniques for DNA amplification and so forth were known off-the-shelf techniques. In the Mayo case itself, doctors had forever been testing for these biopurine metabolites for the very reason described in those claims. And so that was also off-the-shelf. And the same thing was true in the Cleveland Clinic case with respect to testing for the presence of MPO. And that was a decision point in those cases. That's why they were not eligible methods. In this case, the inventors discovered a correlation. It's true between myasthenia gravis and the presence of these musk autoantibodies. But it went the next step, as in cells direct, for example, and deer, and came up with a new assay in order to make use of this discovery. Without the inventors having done the epitope mapping and done the fragmentation, you couldn't have this method. And it is in the claims, I submit, because the claims require the use of labeled musk or an epitope or an antigenic determinant. Those terms are in the claim, and they describe a crucial, essential, that-without-which-not part of this assay, which didn't exist before. You couldn't just, as in the older cases, pull a machine off the shelf and dial it to musk and have the antibodies precipitate out. I hear what you're saying, but what about the fact that your preamble is directed to a method for diagnosing neurotransmission or developmental disorders? It's not directed to a new assay, which is musk. Well, but the assay is, I mean, it's a method of diagnosing by doing these things. I mean, you must do these specific things, right? And in contrast to the earlier cases, it's not, for example, a method of diagnosis by, to use the language of some of the earlier cases, like Cleveland Clinic, for example, simply determining in whatever manner the determiner wishes to use or detecting in one of a litany of known and already in use steps. You've got to do it this way. But your broadest claims are not limited to how it's done. We're not asserting the broadest claims, and that's a good point, right? So we get down to claims 7, 8, and 9, for example. These are the claims we're asserting, and you can only do those methods in that way. You've got to use these epitopes or these fragments, and you've got to do immunoprecipitation. They're not preemptively broad. They're not just determining however you wish to determine or detecting however you wish to detect. You must use these fragments, and you must do it only this way, and that's all these claims cover. And I would also, I would further say in response to an earlier question that, you know, methods of diagnosis, it's true that the preamble of the claim is cast in those terms, but methods of diagnosis are not a suspect class of invention. They're still methods, and as long as there are concrete steps, then the presence of a natural law somewhere within the larger claim, excuse me, does not make the method any less eligible simply because it's a diagnosis. I have a housekeeping question for you. Are you also asserting Claim 6? We are asserting Claim 6. We asserted it. The district court did not address it. To the extent the district court did address it, it's just sort of lumped it in with Claims 7 to 9, and the court's reasoning with respect to Claim 7 to 9 simply doesn't apply. There are some statements in the record to the effect of plaintiffs need additional discovery to determine whether defendants are infringing Claim 6. Athena will focus on Claims 7 through 9 and, to a lesser extent, Claim 6. So your point is that you don't really know what the status is of Claim 6, but it's still in play right now. That's right, and Mayo itself treated Claim 6 separately in its briefing, so there's no question that all the parties understand that these are different technologies, and the district court should have rendered a separate decision with respect to Claim 6 but did not. Let's hear from the other side. We'll save you rebuttal time. Thank you very much. Mr. Singer. Good morning. May it please the court. Jonathan Singer for the Mayo parties. Counsel said that the inventors came up with a, quote, new assay, but the novelty here rests, to the extent the novelty is relevant, in the natural relationship that was discovered. What the patent states about the new assay that was allegedly discovered is as following, and I'm quoting at Column 3, Lines 33 to 37, Appendix 44. It says that the actual steps of detecting autoantibodies in a sample of bodily fluids may be performed in accordance with immunological assay techniques known per se in the art. And then, in respect to iodination, it talks about it being a standard technique in the art, the details of which may be found in References 4 and 6. I hear your adversary to be saying that this is talking about general principles, but then when they actually, the inventors actually went to implement these techniques, there was something more to it, something more. And I understand that's their argument as well. First off, I'll point out that that isn't in the claims, as the court below found, that the complexity described by their expert, for example, is not in the claims. The claims simply require these generalized steps. And the most specific that they get is the iodination. That is the most specific step, or the narrowest step, if you will, Judge Stahl. But the actual complexity is not in the claims. Moreover, just to be fair, the claims aren't limited to the complexity described, even if you were to somehow read it in. The claims permit the use of full musk. So this whole thing of chopping it up into fragments, if you will, and epitopes. The claims cover musk, epitope, or any antigenic determinant thereof. So essentially, anything that will bind musk. So the complexity is not stated in the claims, and it's also not fair to characterize the claims as somehow applying to a fragment of musk only. But even if that were the case, the fact that there's a non-natural fragment in there, this court and other courts have been through this, the use of, I've been before this court, arguing that the use of a non-natural material made something patentable. And that argument was rejected in the Brackett case, where the probes were non-natural fragments of the DNA at issue. That simply doesn't get you over the hurdle. So it seems it's not disputed that they have made a contribution beyond what was already known. So what is the problem with construing their most specific description? Apparently, it is precisely what's being done, is it not? The contribution that wasn't known, Your Honor, is the natural correlation that they found. The specific step, the iodination, if you will, is described by the patent specification as a standard technique in the art. And so in responding to the point about it being complex, if you will, the patent specification identifies the iodination as being done in, I think, two lines in Column 10. And where you look at Column 10, line 50 to 55, it simply says, and they're talking about the ELISA assay, which is Claim 6, the ELISA assay used as identified in the above example is difficult to standardize. And we have tested an alternative assay using immunoprecipitation of I-125 musk. For this test, the purified extracellular domain of musk is iodinated using I-125. Is it your view that the correlation between musk and the incidence of these muscular disorders is the natural law, natural relationship? The correlation of the autoantibody, Judge, yes, absolutely. That is correct. And all this adds is the label and immunoprecipitation. That is correct. That is all the claims add. And it's admitted by the specification that these are claims, that these are additions, if you will, that are standard or known per se in the art. So how does one protect the discovery of the relationship between the musk antibody complex and the disease other than with a Nobel Prize? The relationship, Your Honor, is not protectable. That's the answer. If they want to have a claim to their special method of iodination, they're free to try to get one. And if there's something special about iodinating or something special that requires human intervention in doing this test, they can go get a claim to that and try to articulate it. But what the law prevents, as it currently stands, is a claim that is directed to a natural law that uses conventional steps to elucidate or observe, if you will, that natural law. And that's what this claim absolutely does. They do make, I think, a powerful point that they're essentially, because this goes beyond precedent, where it was known what the product was in the blood. Here to discover the antibodies and the relationship and how to treat it is an advance in the science over precedent. But you're saying because these are natural products, that ends it. Why would anyone do this research in that case? Well, Your Honor, in the Ariosa case, the discovery of the fetal DNA was a remarkable discovery from discarded materials. If you remember from that case, the sera of the mother was typically thrown away. And the discovery of that fetal DNA was a great discovery. The patent system has an incentive effect. There's no doubt about it. But at the same time, the Supreme Court has cautioned that that incentive effect, we shouldn't tie up the basic tools of scientific research purely for that incentive effect. But they're not doing that. This is highly specific. Well, Your Honor, I disagree with you in the sense that what they have done is discover the natural relationship between autoantibodies to musk and myasthenia probis and preempted and claimed a known method for looking at that natural phenomenon or observing that natural phenomenon. And that violates the standards elucidated in the... For the diagnosis of a highly specific disease. That's correct. And that's the natural association we're talking about. And to tie that up with a known test violates the strictures of Mayo and the AMP case as well as this Court's authorities in Ariosa, Cleveland Clinic, for example, as well. You're saying this is medical research, not product development. Fair enough. I think that's one way of phrasing it, Judge Lurie. And I think that I'm not going to comment... I'm not going to opine about incentives one way or the other, whether the incentives in our society exist enough to do medical research versus patents. They both have their role. Which one is better? They both have their role. I would simply... Now, if this had been claimed as a kit containing musk and an immunoprecipitating agent with instructions to add this to bodily fluid and combine them, that would be an article of manufacture, perhaps based on this discovery.  And that would be patent eligible? I don't know. I would have to, to be honest, think about that further. But I think that comes close to the line of, again, applying a conventional test, conventional technology to this. If, Judge Lurie, the steps were related to the difficulties they claim, which the patent doesn't support, but to the extent that there are difficulties in doing this and the kit solved those difficulties, then I think I would agree with you. But simply a kit that has a standard assay in it for detecting... Yeah, but musk is new. No, no, no. Musk is not new. That is a little confusing. But the autoantibody is. But for this purpose. For this purpose. Agreed. That it's new for this purpose. The musk antibodies are new. The musk autoantibodies are new. That's correct. All right. Thank you. Sorry. Sorry. I just wanted to make sure. Just being hyper-technical there. Sorry about that. It's good for you to be that way. It seems to me that the dispute here is whether the claims are directed to one aspect, which is the natural law of the correlation between MG and the musk antibodies, or whether it's also, it's possible, you agree, of course, that a patent could have multiple different things to which it's directed. Like if, in fact, the claims were directed not only to the natural law, but also to something else. For example, the technique of creating this musk autoantibody. Claims could certainly have multiple purposes. I think, in fairness to the lower court judge, the specification, I think, tells us what these claims are directed to with respect to its statement at column, let me find it for you, column 2, which really just depicts claim 1. And it's claim 2, excuse me, specification column 2, lines 61 to 65, which is essentially claim 1 of the patent. And there is provided by a first aspect of the present invention, and that first aspect is what's ultimately claimed, a method of diagnosing neurotransmission disorders in a mammal comprising the step of detecting in a bodily fluid of said mammal autoantibodies to an epitope of the muscle-specific tyrone kinase, musk. So that's what the claims are directed to, a method of diagnosing the neurotransmission disorder based on the presence of the autoantibody to musk. That's what these claims are directed to, and that's what the district court so found. Unless there are further questions, I can address very briefly claim 6. We raised it, Your Honors. They said it sort of wasn't at issue with respect to they wanted further discovery to see whether or not they would assert it, which from my client's perspective means it's at issue. It was briefed by us. They did not raise arguments in response with respect to claim 6, so I think the district court was within its power to say that that claim was invalid as well. I think also in the first briefing I hopefully can provide the appendix site. In the first briefing they said that many of the arguments with respect to claim 7 through 9 applied to claim 6 as well in the first set of briefing, which is where they actually said something about it, and then in the second set of briefing they said nothing at all about it. So they responded, if you will, to Mayo's arguments the first time around and then didn't respond at all the second time around, and so I think the district court was proper to assume that that's all they had to say and that the order with respect to claim 6 is proper as well. Any further questions? Thank you, Your Honors. Thank you. So to find that these claims are directed to the relationship between myasthenia gravis and the presence of musk autoantibodies in serum is really to violate exactly the oversimplification concern in DEER, in CellsDirect, in MACRO, and Vanda. It's in there, right? I mean, the inventors discovered a correlation between myasthenia gravis and these autoantibodies, and that's a good thing because now a whole population of previously undiagnosable patients can be diagnosed and fortunately, in the case of MG, treated. But just because there's a natural law in a claim doesn't mean that the entire claim is directed to the natural law. And just as in CellsDirect, in which the inventors discovered that these liver cells, these hepatocytes, could survive a second round of freezing and thawing, and then they applied that invention to a method that was freezing and thawing the cells a second time, but this court found those claims eligible because they applied the natural law. Same thing in DEER, right? DEER said you can't claim the Arrhenius equation on its own, but if you're using that equation in some new and useful method, then that doesn't disqualify the claim from eligibility. And here, the inventors discovered that correlation and came up with the very first musk autoantibody detection method known. And in order to get there, they had to figure out where the antibodies bound and how to make these fragments in those cases in which fragments are used so that they can be in serum where musk would never naturally be, so that they can be detected, and so that there's no interference with the specific binding. None of that existed before. Unlike the earlier cases like Cleveland and Mayo and so forth, where all the methods for doing the so-called steps were not only known, but in use for those particular reasons already, which is why they were claimed at this very high level of generality that bordered on an abstraction. That is, determine whether there's MPO or determine whether there are these thiopurine metabolites. And I'm not going to tell you how because I didn't come up with a method for it. What I came up with is the correlation. You find out, and then guess what? Apply my correlation. That's not eligible. You mentioned Claim 6. The way I read Claim 6 is all it has in it is a whereby clause, and it's dependent on Claim 3, which is detection. Right. And then it goes back to Claim 2, which requires these antigenic determinants. Right. And so that's the key to Claim 6. I do want to respond also to this question about whether the presence of a man-made element changes what might otherwise be an ineligible claim to an eligible one. And Mayo says, well, BRCA, the BRCA case, the AMBRI case, took care of that because they already had this synthetic DNA in it, and it was ineligible. But the synthetic DNA in that case mirrored exactly the natural sequence. When you have something non-natural, as we do here, either labeled musk or a whole step beyond that, these musk fragments, then you are in this court's AMP1 decision, 689F1303, and I think it's worth quoting. By definition, operations, even known types of steps on transformed subject matter, is the stuff of which most process or method convention consists. Applying various known types of procedures to transformed subject matter is not merely applying conventional steps to law of nature, and that's what we have here. As far as man-made goes, we are in AMP1 and not in AMBRI because there's nothing natural about what we have synthesized. Judge Stoll, you asked earlier whether our method works only for musk, and that's interesting because the court relies in part on the references in the patent that describe the previous MG diagnostic method for acetylcholine receptors, and we know from Dr. DiTomaso's declaration, which the court invited and then ignored, that the acetylcholine test, also immunoprecipitation, also from Myasthenia gravis, cannot be modified to work for musk. It won't pick up the musk autoantibodies, and they use a snake venom toxin for the label to bind to the receptor of interest, and we don't. There's no toxin that won't work that way. So the answer to your question, in short, is it does not work. It does work only for musk. It's new and useful. Okay, thank you. Any more questions? More questions? Thank you very much. Thank you both. The case is taken under submission.